Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
1801 Century Park East, 24th Floor
Los Angeles, CA 90067
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel in Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| DAVID PILL, Derivatively on Behalf of SUPER MICRO COMPUTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES LIANG, DAVID WEIGAND, YIH-SHYAN "WALLY" LIAW, SARA LIU, TALLY LIU, SHERMAN TUAN, JUDY LIN, ROBERT BLAIR, SUSAN MOGENSEN a/k/a SUSIE GIORDANO, and SCOTT ANGEL, <br><br> Defendants, <br><br> and <br><br> SUPER MICRO COMPUTER, INC., <br><br> Nominal Defendant. | Civil Action No. _____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff David Pill ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Super Micro Computer, Inc. ("Super Micro" or the "Company"), its Chief Executive Officer ("CEO"), Chairman, and President; its Chief Financial Officer ("CFO") and former Chief Compliance Officer ("CCO"); its former Senior Vice President of Business Development; and the members of the Company's Board of Directors (the

1

"Board" and, collectively with the Company's officers, the "Individual Defendants") for their breaches of fiduciary duties and violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief, based upon the investigation of and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud lawsuits filed against the Company and certain of its current and former officers and directors, *Bhuva v. Super Micro Computer, Inc.*, No. 3:26-cv-02606-JSC (N.D. Cal.), and *City of Hialeah Employees' Retirement System v. Super Micro Computer, Inc.*, No. 3:26-cv-03018-CRB (N.D. Cal.) (collectively, the "Securities Class Actions"), transcripts of the Company's conference calls with financial analysts and investors, the Indictment unsealed on March 19, 2026 in the United States District Court for the Southern District of New York charging Defendant Yih-Shyan "Wally" Liaw ("Liaw") and others with conspiracy to violate U.S. export-control laws (the "Indictment"), published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a stockholder derivative action brought against certain of the Company's directors and officers for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.    Super Micro designs, manufactures, and sells high-performance servers, storage systems, and related hardware used by enterprises for artificial intelligence ("AI"), cloud computing, and data-center operations. The vast majority of Super Micro's revenues are derived from the sale of servers, many of which integrate advanced Graphics Processing Units ("GPUs") manufactured by Nvidia Corporation ("Nvidia").

2

3.      Because the advanced GPUs that Super Micro integrates into its servers can substantially enhance the AI and military capabilities of foreign adversaries, the U.S. Department of Commerce has, since October 2022, imposed export-control restrictions barring the export and re-export of such chips—and servers containing them—to China and Hong Kong without a license. The Departments' Bureau of Industry and Security ("BIS") has explained that these restrictions reflect a determination that the strategic significance of advanced AI hardware is such that its uncontrolled transfer to China poses an unacceptable risk to U.S. national security and foreign policy. Compliance with these export-control restrictions is therefore a core operational obligation tied directly to the lawful generation of substantially all of the Company's revenues.

4.      The Individual Defendants failed to implement and maintain an effective system of internal controls to ensure the Company's compliance with U.S. export-control laws and to ensure that the Company's public statements concerning such compliance were truthful. Despite their fiduciary obligations and obligations under the Company's governance policies and procedures, the Individual Defendants permitted—and one Defendant personally orchestrated—a systematic, multi-year scheme to divert billions of dollars' worth of Super Micro servers containing advanced Nvidia AI chips into China through a Southeast Asian passthrough company, in flagrant violation of U.S. export-control laws.

5.      The Individual Defendants concealed the lack of adequate internal controls over export-control compliance, and the active export-control violations driving a material portion of the Company's reported sales growth, from stockholders through materially false and misleading statements. From February 2, 2024 through March 19, 2026, the Individual Defendants caused the Company to repeatedly represent that Super Micro "follows all U.S. export control requirements on the sale and export" of GPU systems, that "if we become aware that a third party has exported or reexported without the required licenses, we investigate and take appropriate action," and that the Company's substantial reported sales growth was driven by "strong demand for our AI and green computing solutions" and "technology and product leadership in the AI infrastructure market." Defendant David Weigand ("Weigand"), the Company's CFO and then-CCO, told

3

investors on the Company's May 6, 2025 earnings call that China "continued to represent less than 1% of sales" in the third quarter of fiscal year 2025. Through a letter to *Reuters* sent on the Company's behalf, Super Micro stated that it "goes above and beyond what U.S. export restrictions require" by proactively ensuring its customers do not violate the restrictions.

6.    Each of these statements was materially false. In reality, as the Individual Defendants knew or recklessly disregarded, Defendant Liaw, a co-founder of the Company, and, during the relevant period, a Board member and Senior Vice President of Business Development, was personally orchestrating a scheme to divert at least approximately $2.5 billion worth of Super Micro servers containing controlled Nvidia GPUs to customers in China, in conscious violation of U.S. export-control laws. The scheme operated through a Southeast Asian passthrough entity that placed purchase orders with Super Micro for servers purportedly for its own use, then, at the direction of Defendant Liaw and his co-conspirator, used a logistics company to repackage the servers, place them in unmarked boxes, and ship them to their final destinations in China. The conspirators fabricated false records to support the diversion and, on at least one occasion, staged "dummy" servers to fool customer-site inspections, photographs of which were transmitted to Defendant Liaw.

7.    The unlawful scheme was massive in scope and central to the Company's reported sales narrative. According to the Indictment, between calendar years 2024 and 2025, the passthrough entity purchased approximately $2.5 billion worth of servers from the Company. Between late April 2025 and mid-May 2025 alone, at least approximately $510 million worth of Super Micro servers, assembled in the United States, were diverted to China in violation of U.S. export-control laws. The passthrough entity became one of Super Micro's most significant customers—according to an internal Company spreadsheet for the fourth quarter of fiscal year 2024, the passthrough entity ranked as Super Micro's eleventh most profitable customer worldwide, accounting for approximately $99.7 million in revenue for the quarter, alongside major U.S. technology and social media companies developing artificial intelligence infrastructure.

8.    The Individual Defendants ignored repeated red flags signaling that the Company lacked effective internal controls over compliance with U.S. export-control laws, the Company's public statements regarding export-control compliance were materially false and misleading,  and that the Company's reported sales growth was, at least in part, the product of illegal conduct:

(a)    On April 23, 2024, *Reuters* reported that Chinese universities and research institutes had recently obtained high-end Nvidia AI chips, despite the export restrictions on the technology, embedded in server products made by Super Micro and other server manufacturers. Rather than meaningfully investigate the report, the Individual Defendants caused the Company to issue a series of categorical denials. No remedial action was taken, no internal investigation was announced, and the same diversion scheme continued unabated.

(b)    On August 12, 2024, *The Information* published an article regarding Super Micro and its compliance with export-control laws. The article's central premise, that AI-chip smuggling into China had become a structured industry, in which Super Micro's servers were specifically implicated, should have placed the Individual Defendants on alert that the Company's compliance representations could not be sustained. No corrective action was taken.

(c)    On December 19, 2024, *Reuters* and *The Information*  reported that Nvidia had asked its large distributors, including Super Micro, to conduct spot checks of their customers in Southeast Asia to verify that those customers were still in possession of the servers equipped with Nvidia chips and had not on-sold them to China. Nvidia's request was prompted by an inquiry from the U.S. Department of Commerce as to how Nvidia chips were being smuggled into China despite export controls. Super Micro again responded with categorical denials. In a token gesture, the Company also published an "Export Compliance Policy" on its website in December 2024—pledging "full compliance" with U.S. export laws—but failed to take any meaningful operational step to investigate or arrest the ongoing diversion scheme. The misconduct continued.

9.       While the Individual Defendants caused the Company to make these materially false and misleading statements, the Company's stock price traded at artificially inflated prices. Riding on revenue growth driven, at least in part, by illegal export-controlled sales to China, the Company reported fiscal year 2024 revenue of $14.94 billion (an increase of 110% year-over-year) and fiscal year 2025 revenue of $22.0 billion (an increase of 47% year-over-year). The Individual Defendants caused the Company to issue Annual Reports on Form 10-K for fiscal years 2024 and 2025 touting  these reported sales results and attributing them to "strong demand and increased billings for GPU & Super Racks" —without disclosing that material portions of those billings were the product of conduct in violation of U.S. export-control laws.

10.       On March 19, 2026, the United States Attorney's Office for the Southern District of New York announced that a federal grand jury had returned an indictment charging Defendant Liaw and two of his co-conspirators with conspiracy to commit export-control violations. On the same day, Defendant Liaw was arrested by federal agents. The Indictment alleged in detail the scheme described above.

11.       On March 20, 2026, in response to the disclosures, the price of Super Micro's common stock declined $10.26 per share, or approximately 33%, wiping out billions of dollars in stockholder value in a single trading session. Following the disclosure, Super Micro placed Defendant Liaw and another employee co-conspirator on administrative leave and terminated its relationship with the contractor co-conspirator.[1] To Plaintiff's knowledge, the Board has taken no action to recover the proceeds of the illegal sales, to investigate the failures of governance that enabled the scheme, or to remediate the internal-control failures the scheme exposed.

12.       The Individual Defendants' failures were not the product of inattention to a remote risk; they were the product of conscious disregard for a known, recurring risk that had previously been identified at the Company. As recently as August 2024, in the immediate aftermath of the publication of a report by Hindenburg Research, the Company faced public allegations that it had circumvented U.S. trade restrictions imposed in response to Russia's invasion of Ukraine by

---

[1] Liaw later departed the Company.

6

shipping products into the Russian Federation in "larger-than-ever volumes" through a California distributor and a "web of Turkish shell companies." Those allegations, which prompted regulatory scrutiny and the resignation of the Company's independent auditor in October 2024, made unmistakably clear to the Individual Defendants that the Company's export-compliance function required immediate, top-to-bottom remediation. The Individual Defendants made no such remediation. Instead, they permitted an even more brazen export-control violation scheme—this one orchestrated by Defendant Liaw, who had been re-appointed to the Board only months before the China diversion scheme began—to proceed without meaningful oversight.

13. On March 25, 2026, securities class actions began to be filed against Super Micro, Defendants Charles Liang ("Liang"), Weigand, and Liaw, based on the misconduct alleged herein. As a result, the Company will incur substantial costs defending itself and its officers in the Securities Class Actions and faces further substantial costs in the event of adverse judgments.

14. Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The Director Defendants (defined below) are neither disinterested nor independent. Absent this action, Super Micro will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.    JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This Court has jurisdiction over each Defendant named herein because Super Micro maintains its headquarters and does substantial business in this District, and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional

notions of fair play and substantial justice, and because the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the facilities of the national securities markets located in this District, in connection with the acts alleged herein.

17. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), where the Company maintains its headquarters and where it conducts substantial business.

## III. THE PARTIES

### A. Plaintiff

19. Plaintiff David Pill ("Plaintiff") has been a stockholder of Super Micro continuously since March 19, 2024, and was a stockholder at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of Super Micro in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B. Nominal Defendant

20. Nominal Defendant Super Micro Computer, Inc. is a Delaware corporation with its principal executive offices located at 980 Rock Avenue, San Jose, California 95131. Super Micro's common stock trades on the Nasdaq Stock Market ("Nasdaq") under the ticker symbol "SMCI." As of January 31, 2026, Super Micro had approximately 598,989,428 shares of common stock outstanding (reflecting the ten-for-one forward stock split that the Company effected on September 30, 2024). Super Micro is named solely as a nominal party in this action.

### C. Officer Defendants

21. Defendant **Liang** has served as Super Micro's President, CEO, and Chairman of the Board continuously since the Company's inception in September 1993. Liang co-founded the Company. Liang is not an independent director, and the Company's Definitive Proxy Statement filed with the SEC on March 3, 2026 (the "2026 Proxy Statement") does not list Liang as an

independent director. Liang is a named defendant in the Securities Class Actions. Liang signed, in his capacity as President and CEO, the Company's Annual Reports on Form 10-K for fiscal years 2024 (filed February 25, 2025)  (the "2024 10-K") and 2025 (filed August 28, 2025) (the "2025 10-K"), and the Company's Quarterly Reports on Form 10-Q filed throughout the period of misconduct alleged herein, and certified the accuracy of those reports pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"). In fiscal year 2024, Liang received $28,094,976 in option awards.

22.    Liang's $28,094,976 Option Awards value for fiscal year 2024 represents the grant-date fair value of the November 14, 2023 performance-based option to purchase up to 5,000,000 shares of Super Micro common stock at an exercise price of $45.00 per share (the "2023 CEO Performance Award"). Between February 27, 2025 and August 26, 2025, the Compensation Committee certified the achievement of four of the five revenue milestones under the 2023 CEO Performance Award and approved vesting of 4,000,000 of the 5,000,000 shares subject to the option. The milestones were certified at $13.0 billion (Feb. 27, 2025), $15.0 billion, $17.0 billion, $19.0 billion (April 22, 2025), and $21.0 billion (August 26, 2025). Each of these revenue figures included revenues generated from the export-control diversion scheme alleged herein.

23.    Defendant **Weigand** has served as Super Micro's Senior Vice President and CFO since February 2021[2] and as Corporate Secretary. Weigand served as CCO until March 2026. Weigand is a named defendant in the Securities Class Actions. Weigand signed, in his capacity as CFO, the Company's 2024 and 2025 Forms 10-K, and the Company's Quarterly Reports on Form 10-Q filed throughout the period of misconduct alleged herein and certified the accuracy of those reports pursuant to Sections 302 and 906 of SOX. Since fiscal year 2023, Weigand has received the following compensation from Super Micro:

---

[2] The Company announced its intent to search for a new CFO in December 2024 but the Company retained Weigand as CFO in the interim.

| Year | Salary ($) | Bonus ($) | Stock Awards | Option Awards | Non-Equity Incentive | All Other | Total |
|------|-----------|-----------|--------------|---------------|----------------------|-----------|-------|
| 2023 | $522,151 | $148,568 | $1,021,243 | N/A | $167,127 | N?A | **$1,859,089** |
| 2024 | $540,505 | $191,245 | $3,456,617 | $5,254,101 | $110,060 | $250 | **$9,552,778** |
| 2025 | $557,958 | $180,979 | $180,979 | N/A | $55,638 | $441 | **$1,961,333** |

24.     Defendant **Liaw** served as Super Micro's Senior Vice President, Business Development from August 2022 until his departure from the Company in March 2026, and served as a member of Super Micro's Board from his reappointment in December 2023[3] until March 2026. Liaw co-founded the Company in September 1993 and was previously employed by Super Micro from 1993 through January 2018, during which time he held various executive positions, including Senior Vice President of Worldwide Sales and Corporate Secretary, and served on the Board. Liaw received total compensation of $1,818,812 in fiscal year 2025 from Super Micro. Liaw is a named defendant in one of the Securities Class Actions.

25.     On March 19, 2026, the United States Attorney's Office for the Southern District of New York announced the Indictment charging Liaw with conspiracy to violate U.S. export-control laws and Liaw was arrested by federal agents the same day. The Indictment alleges that Liaw and his co-conspirators caused the sale of at least approximately $2.5 billion worth of Super Micro servers to a Southeast Asian passthrough entity between calendar years 2024 and 2025, with the knowledge that the majority of those servers would be diverted to China in violation of U.S. export-control laws.

26.     Defendants Liang, Weigand, and Liaw are collectively referred to herein as the "Officer Defendants."

**D.     Director Defendants**

27.     Defendant **Sara Liu** ("Sara Liu") has served as a Super Micro director since the Company's inception in September 1993 and currently serves as Senior Vice President of the Company. Sara Liu co-founded the Company. She previously held the positions of Treasurer

---

[3] Liaw resigned from all of his positions with the Company in January 2018 in connection with an Audit Committee investigation related to the restructuring of the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting.

10

(1993–2019), Senior Vice President of Operations (2014–2018), and Chief Administrative Officer (1993–2019). Sara Liu is not an independent director, and the 2026 Proxy Statement does not list Sara Liu as an independent director. In fiscal year 2025, Sara Liu received $1,227,385 in compensation from Super Micro.

28.    Defendant **Tally Liu** ("Tally Liu") has served as a director of Super Micro since January 2019, currently serves as Chair of the Audit Committee, and is a member of the Compensation Committee. The Board has determined Tally Liu to be a financial expert as defined in Item 407 of Regulation S-K. In fiscal year 2025, Tally Liu received the following compensation from Super Micro:

| Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2025 | $240,000 | $112,468 | $154,900 | $507,368 |

29.    Defendant **Sherman Tuan** ("Tuan") has served as a Super Micro director since February 2007 and is a member of the Compensation Committee and the Nominating and Corporate Governance Committee ("Governance Committee"). In fiscal year 2025, Tuan received the following compensation from Super Micro:

| Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2025 | $129,385 | $160,768 | $0 | **$290,153** |

30.    Defendant **Judy Lin** ("Lin") has served as a director of Super Micro since April 2022 and currently serves as Chair of the Governance Committee. Since fiscal year 2023, Lin received the following compensation from Super Micro:

| Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2025 | $210,827 | $80,384 | $127,436 | $418,647 |

31.    Defendant **Robert Blair** ("Blair") has served as a Super Micro director since December 2022 and is a member of the Audit Committee and the Governance Committee. The

11

Board has determined Blair to be a financial expert as defined in Item 407 of Regulation S-K. In fiscal year 2025, Blair received the following compensation from Super Micro:

| Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $216,375 | $80,384 | $127,436 | $424,195 |

32.    Defendant **Susan Mogensen**, also known as **Susie Giordano** ("Giordano"), has served as a Super Micro director since August 2024 and currently serves as Chair of the Compensation Committee. Giordano has served as Chief Legal Officer of Lime since September 2024. In fiscal year 2025, Giordano received the following compensation from Super Micro:

| Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $76,894 | $166,503 | $0 | $243,397 |

33.    Defendant **Scott Angel** ("Angel") has served as a director of Super Micro since March 2025, as a member of the Audit Committee, and as Lead Independent Director since January 2026. The Board has determined Angel to be a financial expert as defined in Item 407 of Regulation S-K. Prior to joining the Board, Angel spent over 37 years in the audit and assurance practice at Deloitte & Touche LLP ("Deloitte"), including 25 years as an audit partner in Silicon Valley, and led the semiconductor industry practice from 1993 until his retirement from Deloitte in December 2017. In fiscal year 2025, Angel received the following compensation from Super Micro:

| Year | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2025 | $216,375 | $80,384 | $127,436 | $424,195 |

34.    Defendants Liang, Weigand, Liaw, Sara Liu, Tally Liu, Tuan, Lin, Blair, Giordano, and Angel are collectively referred to herein as the "Individual Defendants." Defendants Sara Liu, Liaw, Tally Liu, Tuan, Lin, Blair, Giordano, and Angel are collectively referred to herein, together with Defendant Liang in his capacity as a director, as the "Director Defendants." Defendants Liang, Sara Liu, and Liaw are referred to as the "Co-Founder Defendants."

12

## IV.     INDIVIDUAL DEFENDANTS' DUTIES

35.     By reason of their positions as officers or directors of Super Micro and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Super Micro and its stockholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Super Micro in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Super Micro and its stockholders to benefit all stockholders equally and not in furtherance of their own personal interests or benefit.

36.     The Individual Defendants, because of their positions of control and authority as directors and officers of Super Micro, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     As officers and directors of a publicly traded company whose common stock was registered with the SEC and trades on Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Super Micro's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Super Micro's management, policies, and internal controls.

38.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Super Micro and were always acting within the course and scope of such agency.

39.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Super Micro.

### A.     Duties Under Super Micro's Code Of Business Conduct And Ethics

40.     Super Micro's Code of Business Conduct and Ethics (the "Code of Conduct"), revised as of October 28, 2020, applies to directors, officers, and employees of Super Micro. The

13

Code of Conduct identifies as among its purposes the encouragement of, among other things, "[c]ompliance with applicable governmental laws, rules and regulations," "[h]onest and ethical conduct," and "[p]rompt internal reporting of any violations of law or the Code."

41.    The Code of Conduct imposes a categorical and unqualified duty of legal compliance:

> The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply. . . . If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, and civil actions and penalties, you also subject the Company to the same risks and penalties.

42.    The Code of Conduct specifically designates Super Micro's CEO, CFO, and Chief Compliance Officer as responsible for promoting compliance:

> The Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Compliance Officer ("Compliance Officer"), General Counsel and Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

43.    The Code of Conduct requires full, fair, accurate, timely, and understandable public disclosures:

> All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company. . . . You are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

44.    The Code of Conduct highlights that the CEO and CFO are "responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules)."

45.    The Code of Conduct requires fair dealing:

14

You should deal honestly with the Company's customers, suppliers, competitors and employees. Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing.

46.    The Code of Conduct further requires reporting of any violation or suspected violation of the Code, applicable laws, or governmental regulations, and provides confidential and anonymous reporting channels—including via mail addressed directly to the Audit Committee Chair at the Company's headquarters.

47.    The Code of Conduct requires an internal investigation following the reporting of any violation:

When an alleged violation of the Code, applicable laws and/or governmental regulations is reported, the Company will investigate and determine, or designate appropriate persons to investigate and determine, the legitimacy of the reports. Any suspected violation should be immediately reported to the Compliance Officer; however, to the extent that the suspected violation involves the Compliance Officer, such suspected violation should be immediately reported to the Chair of the Audit Committee. The Compliance Officer or the Chair of the Audit Committee, as applicable, shall assess the situation and determine the appropriate course of action.

**B.    Duties Under The Board Of Directors Charter**

48.    The Board of Directors Charter, as amended through July 30, 2025 (the "Board Charter"), establishes the role of the Board and the standards of conduct and independence applicable to directors. The Board Charter provides that the Board "is the ultimate decision-making body of the Company" and that "[t]he fundamental role of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders."

49.    The Board Charter requires that "the Board will consist of a majority of directors who qualify as independent directors" and that the Board "shall affirmatively determine . . . that the directors designated as Independent Directors have no material relationships with the Company or its management . . . that may interfere with the exercise of their independence from management and the Company."

50.    The Board Charter authorizes the Board to "conduct investigations" and to retain outside legal counsel and advisors "without consulting with or obtaining approval from any officer

15

of the Company"—a power the Board has, to Plaintiff's knowledge, not exercised with respect to the export-control violations alleged herein, notwithstanding that one of the directors has been criminally indicted for the same conduct.

### C.    Additional Duties Of Audit Committee Members

51.    The Audit Committee Charter, as amended through July 30, 2025 (the "Audit Committee Charter"), sets forth additional duties for members of the Audit Committee. The Audit Committee is charged with assisting the Board in its oversight of, among other things, "the Company's compliance with legal and regulatory requirements"—a category that includes compliance with U.S. export-control laws.

52.    The Audit Committee Charter imposes the following specific responsibilities relevant to the conduct at issue in this action:

> Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.                        .                        .                        .

> Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary    or    other    measures    with    respect    to    such    conduct.

> Periodically review and discuss with management the Company's major financial risk exposures, as well as other major current and emerging risk exposures, including but not limited to, operational risks, health and safety risks, technology, privacy and cybersecurity risks, and strategic risks, and the steps management has taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines, policies and procedures.

53.    The Audit Committee Charter further provides the Audit Committee with the authority, and the corresponding obligation, to investigate and take remedial action upon receipt of any complaint or report concerning "accounting, internal accounting controls or auditing matters." The Code of Conduct designates the Audit Committee Chair at the Company's San Jose headquarters as the recipient of confidential and anonymous reports of misconduct. The Audit

Committee Defendants—Tally Liu (Chair), Blair, and Angel—failed to perform these essential and Charter-imposed duties by failing to investigate the repeated red flags concerning Super Micro's export-control violations or to take meaningful remedial action upon those red flags.

**D.    Additional Duties Of Compensation Committee Members**

54.    The Compensation Committee Charter, as amended through July 30, 2025 (the "Compensation Committee Charter"), requires the Compensation Committee to, among other things, "[m]onitor and assess risks associated with the Company's compensation policies, including whether such policies could lead to unnecessary risk-taking behavior, and consult with management regarding such risks." The Compensation Committee Charter further charges the Compensation Committee with administering equity-based incentive compensation, including the 2023 CEO Performance Award. The Compensation Committee Defendants—Giordano (Chair), Tuan, and Tally Liu—failed to assess and address the risk that the Company's compensation arrangements with the Officer Defendants—including Defendant Liaw, whose senior-officer compensation depended on the appearance of Business Development success, and Defendant Liang, whose 2023 CEO Performance Award milestones depended on the appearance of revenue growth—could incentivize, and did incentivize, conduct that violated the Code of Conduct and U.S. export-control laws.

**E.    Additional Duties Of Governance Committee Members**

55.    The Nominating and Corporate Governance Committee Charter, as amended through July 30, 2025 (the "Governance Committee Charter"), charges the Governance Committee with, among other things, "[c]onduct[ing] an annual evaluation of each director's independence according to applicable Exchange rules, applicable law and the Company's corporate governance guidelines"; recommending to the Board that a director "submit his or her resignation from the Board if . . . continuing service on the Board by the individual is not consistent with the criteria deemed necessary for continuing service on the Board"; and "[p]rovid[ing] guidance and recommendations to the Board regarding legal compliance matters." The Governance Committee Defendants—Lin (Chair), Blair, and Tuan—have failed to perform these duties by, among other

17

things, declining to recommend Defendant Liaw's resignation from the Board following the unsealing of the Indictment, and by failing to advise the Board with respect to the legal compliance failures that gave rise to the Indictment.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

56.    Super Micro is a technology company that designs, manufactures, and sells high-performance servers, data-storage systems, and related hardware used by enterprises for AI, cloud computing, and large-scale data-center operations. The Company derives substantially all of its revenue from the sale of servers, many of which integrate advanced AI accelerator chips manufactured by Nvidia. Super Micro maintains a strategic "first-to-market" relationship with Nvidia that permits it to ship the latest GPU architectures in advance of certain competitors. As Super Micro disclosed in its 2024 10-K, the Company experienced "increased net sales from server and storage systems, particularly from [its] large enterprise and datacenter customers . . . due to the strong demand for GPU based rack-scale solutions."

57.    On September 30, 2024, after the market close, Super Micro effected a ten-for-one forward split of the Company's common stock. All share counts and per-share prices stated in this Complaint reflect post-split figures unless otherwise indicated.

### B.    The Co-Founder Defendants Control The Company

58.    The Company was co-founded in 1993 by Defendants Liang, Sara Liu, and Liaw. According to the 2026 Proxy Statement, Defendants Liang and Sara Liu jointly own 82,084,339 shares of the Company's outstanding common stock, representing approximately 13.4% of the shares outstanding as of January 31, 2026. Defendant Liaw beneficially owned an additional 15,546,165 shares (approximately 2.6%), of which 15,184,220 shares were held by The Liaw Family Trust, for which Liaw and his spouse serve as trustees. In the aggregate, the Co-Founder Defendants control approximately 16.0% of the Company's outstanding common stock—a substantial concentration of voting power within a single, related stockholder group.

18

59.    The Co-Founder Defendants' substantial ownership gives them significant control over Super Micro's management and affairs, including over matters requiring stockholder approval such as the election of directors, financing activities, mergers and significant corporate transactions, and the approval of executive compensation. Moreover, as the Company disclosed in its 2025 10-K, the Company has a key-person dependency on Defendant Liang, who has served as President, CEO, and Chairman continuously since the Company's inception in 1993.

60.    Defendant Liaw's status as a co-founder and, during the relevant period, a member of the Board and a senior officer of the Company gave him similar standing within the Company's leadership structure and direct, unsupervised access to the senior officials at Super Micro and its Taiwan operations responsible for the export-licensing and customer-onboarding controls he allegedly subverted..

## C.    The October 2022 Export-Control Restrictions And The Resulting Compliance Imperative

61.    In October 2022, the BIS  published a rule introducing license requirements on the export or re-export of advanced computing chips, including the Nvidia GPUs that Super Micro integrates into its highest-margin server products, and semiconductor manufacturing equipment to China and Hong Kong. Applications for licenses are reviewed under a "presumption of denial." The rule therefore effectively bars the export and re-export of advanced AI servers, including those manufactured by Super Micro, to Chinese end users.

62.    The BIS explained that the export controls were imposed to protect U.S. national security and foreign-policy interests by restricting China's ability "to produce advanced military systems including weapons of mass destruction; improve the speed and accuracy of its military decision making, planning, and logistics, as well as of its autonomous military systems; and commit human rights abuses." The restrictions thus reflect a formal U.S. government determination that the computing capabilities in advanced AI accelerator hardware are of strategic significance.

19

63.    As the Company itself acknowledged in its public filings throughout the period of misconduct alleged herein, Super Micro's products were directly subject to these restrictions. In its 2024 10-K, the Company disclosed that the export controls "impacted certain of our products, including products that contain the NVIDIA A100 and H100 integrated circuits, among others."

64.    Compliance with U.S. export-control laws was therefore, for Super Micro, a core operational matter critical to Super Micro's success, mandating substantial oversight. The Audit Committee Charter, the Board Charter, and the Code of Conduct each required the Individual Defendants to oversee the Company's compliance with these laws. The Company's compliance program was led by Defendant Weigand in his capacity as CCO.

**D.    Defendant Liaw's Departure And Subsequent Re-Appointment To The Board**

65.    Defendant Liaw's role in the conduct giving rise to this action cannot be evaluated independent of his prior departure from the Company. From the Company's founding in 1993 until January 2018, Liaw was an employee and held various executive positions, including Senior Vice President of Worldwide Sales and Corporate Secretary, and was a member of the Board of Directors. In January 2018, at a time when the Company was not current in its filings with the SEC and was the subject of an Audit Committee investigation related to a "restructuring of the Company's sales organization as part of the Company's remediation of material weaknesses in its internal control over financial reporting[,]" Liaw resigned from all of his positions with the Company, including his Board seat. The SEC subsequently charged the Company with widespread accounting violations that included improper revenue-recognition practices and material misstatements of the Company's financial reports, ultimately resulting in a $17.5 million settlement and the obligation of Defendant Liang personally to reimburse the Company $2.1 million in stock-sale profits.

66.    Liaw returned to Super Micro as a consultant in May 2021, and in August 2022 was appointed Senior Vice President, Business Development. On December 8, 2023, the Company filed a Current Report on Form 8-K with the SEC announcing that Liaw had been re-appointed to

20

the Board of Directors. The period of misconduct alleged herein began approximately two months later, on February 2, 2024. At the Company's January 2024 annual meeting of stockholders, the Board nominated Liaw for, and the Company's stockholders re-elected Liaw to, a full three-year term as a director.

67. The Board re-appointed Defendant Liaw to a senior-officer position and to the Board notwithstanding (a) his prior departure under circumstances tied to the remediation of material weaknesses in the Company's internal control over financial reporting; (b) the absence of any independent investigation by the Board or its Audit Committee into the conduct that led to his 2018 departure; and (c) the absence of any meaningful enhancement of the Company's export-compliance function in the period leading up to his re-appointment, notwithstanding the introduction of the October 2022 export-control restrictions. The foreseeable consequence of the Board's failure to remediate before re-appointment was that Liaw was put back in charge of the Company's Business Development organization at precisely the moment when the export-controlled-chip diversion industry described in *The Information*'s August 12, 2024 article was emerging.

**E.     The Board's Failure To Oversee Export-Control Compliance**

68. From the introduction of the October 2022 export-control restrictions through the beginning of the relevant period, and continuing throughout the period of misconduct alleged herein, the Individual Defendants failed to implement or maintain any effective system of internal controls to ensure the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware. The Individual Defendants did not establish or supervise an effective end-user verification function, did not establish or supervise an effective distribution-channel auditing function, and did not establish or supervise an effective process for investigating publicly available reports that Super Micro servers were being diverted to controlled-end-user destinations in China.

69. The Individual Defendants also failed to remediate known and recently documented export-control failures. Approximately five months before the period of misconduct alleged herein

21

began, the August 27, 2024 report by Hindenburg Research alleged in detail that Super Micro had circumvented U.S. trade restrictions imposed in response to Russia's invasion of Ukraine by shipping products into the Russian Federation in "larger-than-ever volumes" through a California distributor and a network of Turkish shell companies. The Department of Justice opened an investigation. The Company's independent auditor, Ernst & Young LLP ("EY"), resigned in October 2024, citing concerns about, among other matters, "the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management." Notwithstanding these unmistakable warnings about the Company's export-compliance function, the Individual Defendants did not implement any meaningful remediation of that function. They permitted Defendant Liaw, already in possession of the Senior Vice President of Business Development title and a Board seat, to direct the very Business Development organization through which the diversion scheme was conducted.

70.    Tellingly, the Audit Committee was actively meeting throughout the period of misconduct alleged herein and was in possession of substantial information bearing on the Company's compliance and internal-control posture. According to the 2026 Proxy Statement, the Audit Committee met seventy times during fiscal year 2025 alone, four regularly scheduled meetings and sixty-six special meetings. The Audit Committee Defendants thus cannot credibly maintain that they were unaware of the operational and compliance risks facing the Company; their unique vantage point is, instead, an indictment of their failure to identify, investigate, or remediate the export-control violations being orchestrated by Defendant Liaw.

**F.    The Individual Defendants Allowed The Dissemination Of Material False And Misleading Statements**

71.    Throughout the relevant period, the Individual Defendants caused the Company to issue public statements concerning the Company's compliance with U.S. export-control laws and the sources of the Company's reported sales growth.

72.    On February 2, 2024, Super Micro filed with the SEC its Quarterly Report on Form 10-Q for the second quarter of fiscal year 2024 (the "Q2 FY24 10-Q"), which was signed by

Defendants Liang and Weigand. The Q2 FY24 10-Q contained SOX Section 302 certifications signed by Defendants Liang and Weigand attesting that "the financial statements and other financial information" therein "fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of and for the periods presented in this report." The Q2 FY24 10-Q incorporated by reference the "Risk Factors" section of the Company's Annual Report on Form 10-K for fiscal year 2023 ("2023 10-K"), including the representation that "[i]f we fail to comply with laws and regulations restricting dealings with sanctioned countries or companies and/or persons on restricted lists, we may be subject to civil or criminal penalties."

73. On April 23, 2024, *Reuters* reported that Chinese universities and research institutes had recently obtained high-end Nvidia AI chips despite the export restrictions on the technology. According to the article, tender documents showed that Chinese entities obtained the chips embedded in server products made by Super Micro and other server manufacturers. The article quoted Super Micro as stating that it "complied with U.S. requirements on the sale and export of [Graphics Processing Unit] systems to regions and parties that require licenses," and that "[i]f we become aware that a third party has exported or reexported without the required licenses, we investigate the matter and take appropriate action."

74. Additionally, the law firm Clare Locke LLP sent a letter to *Reuters* on Super Micro's behalf representing that the Company "goes above and beyond what U.S. export restrictions require" by proactively taking steps to ensure its customers do not violate the curbs.

75. On May 6, 2024, Super Micro filed with the SEC its Quarterly Report on Form 10-Q for the third quarter of fiscal year 2024 (the "Q3 FY24 10-Q"), signed by Defendants Liang and Weigand and accompanied by their SOX Section 302 certifications. The Q3 FY24 10-Q incorporated by reference the same export-compliance risk-factor language from the 2023 F10-K.

76. On August 6, 2024, Super Micro issued a press release announcing financial results for the fourth quarter and full fiscal year 2024, including fiscal year 2024 net sales of $14.94 billion (an increase of 110% year-over-year). In the press release, Defendant Liang represented that the Company's growth was driven by "record demand of new AI infrastructures propelling fiscal 2024

23

revenue up 110% to $14.9 billion" and that the Company was "well positioned to become the largest IT infrastructure company."

77. On August 12, 2024, *The Information* published an article titled "*Nvidia AI Chip Smuggling to China Becomes an Industry*," reporting on the emergence of a structured industry diverting advanced AI chips into China and identifying Super Micro's servers as among the products implicated. The article quoted Super Micro as stating: "We follow all US export control requirements on the sale, service, support, and export of our GPU-based systems. If we find out that a third party has exported these without required licenses, we promptly investigate the matter and take appropriate action."

78. On August 28, 2024, Super Micro issued a press release announcing that it would not timely file its Annual Report on Form 10-K for fiscal year 2024. Two days later, on August 30, 2024, the Company filed with the SEC a Notification of Late Filing on Form NT 10-K, disclosing that the delay was attributable to "information that was brought to the attention of the Audit Committee of the Company's Board of Directors" which had caused the Board to form "a committee to review certain of the Company's internal controls and other matters" (the "Special Committee"). The Form NT 10-K did not identify the substance of the "other matters" under review, but as the Company would subsequently disclose, those matters included the Company's failure to comply with U.S. export-control laws. In response to the August 28, 2024 announcement, the price of Super Micro common stock declined 19%, from a closing price of $54.76 on August 27, 2024 to a closing price of $44.35 on August 28, 2024 (pre-split equivalents).

79. On October 30, 2024, Super Micro filed a Current Report on Form 8-K announcing the resignation of EY as the Company's independent registered public accounting firm. Among other things, the 8-K disclosed that EY had communicated to the Audit Committee concerns about "the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management." EY further stated, in its resignation letter, that it was "unwilling to be associated with the financial statements prepared by management." The Company subsequently engaged BDO USA, P.C. ("BDO") as its

24

successor independent registered public accounting firm. As alleged below, EY's October 24, 2024 resignation occurred contemporaneously with the obstruction by Defendant Liaw and Super Micro sales manager Ruei-Tsang 'Steven' Chang ('Chang') of an internal compliance audit of the Southeast Asian passthrough entity later identified in the Indictment as 'Company-1,' and approximately five weeks before the Company would disclose that EY's concerns included at least eleven specific export-control transactions.

80. On November 13, 2024, Super Micro filed with the SEC a Notification of Late Filing on Form NT 10-Q, announcing that the Company would not timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2024 because of the Special Committee's continuing work and "other work that is ongoing." This was the second consecutive missed periodic-report filing deadline by the Company. The Director Defendants, including the members of the Audit Committee at the time, again failed to identify, investigate, or remediate the export-control violations the Special Committee was simultaneously failing to detect.

81. On December 2, 2024, Super Micro filed a Current Report on Form 8-K with the SEC, signed by Defendant Liang and attaching a press release disclosing the findings of the Special Committee's review. The December 2, 2024 8-K disclosed, among other things, that EY had communicated concerns to the Audit Committee regarding "[e]xport control matters" and had specifically identified eleven export transactions for further review. The December 2, 2024 8-K further disclosed that the Special Committee's "Review focused on whether, at the time of shipment, [the eleven] transactions complied with relevant U.S. export laws and regulations." The Special Committee, the work of which was reviewed and approved by the Audit Committee (which included Defendants Tally Liu and Blair), concluded that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions, or that anyone at the Company was aware that any of its products might be diverted to a prohibited end user or location," and that "it appears the Company has implemented a reasonable program for compliance with applicable export control regulations." The Special Committee's conclusion was the product of an investigation that, as the Indictment unsealed on March 19, 2026 would later

demonstrate, missed the largest export-control violation scheme in the Company's history. That scheme was being personally orchestrated by Defendant Liaw, then a member of the Super Micro Board, generating billions of dollars in unlawful sales, and was ongoing as of the date of the Special Committee's report. The Audit Committee authorized and relied upon the Special Committee's conclusion and thereafter failed to investigate or remediate. This constitutes a discrete and grave failure of Audit Committee oversight, and each of them has a substantial likelihood of liability therefor.

82. On December 19, 2024, *Reuters* and *The Information* reported that Nvidia had asked its large distributors, including Super Micro, to conduct spot checks of their customers in Southeast Asia to verify that those customers were still in possession of the servers equipped with Nvidia chips and had not sold them to China. Nvidia's request was prompted by an inquiry from the U.S. Department of Commerce as to how Nvidia chips were being smuggled into China despite export controls. Super Micro responded with categorical denials of any diversion involving its products. In the same month, Super Micro published on its website an "Export Compliance Policy" pledging "full compliance" with U.S. export laws.

83. On February 25, 2025, more than seven months after the close of fiscal year 2024 and after a substantial filing delay, Super Micro filed its 2024 10-K. The 2024 10-K was signed by Defendants Liang, Weigand, Sara Liu, Liaw, and the other directors then serving, and incorporated SOX Section 302 certifications signed by Liang and Weigand. The 2024 10-K represented that the Company's internal control over financial reporting was effective as of June 30, 2024, that the Company maintained controls to ensure compliance with applicable laws and regulations, and that the Company's reported sales growth was attributable to "strong demand and increased billings for GPU & Super Racks."

84. On May 6, 2025, Super Micro held its third quarter fiscal year 2025 earnings call. During the call, Defendant Weigand represented that China "continued to represent less than 1% of sales" in the third quarter of fiscal year 2025.

26

85.    On May 12, 2025, Super Micro filed its Quarterly Report on Form 10-Q for the third quarter of fiscal year 2025 (the "Q3 FY25 10-Q"), signed by Defendants Liang and Weigand and accompanied by their Sarbanes-Oxley certifications. The Q3 FY25 10-Q repeated the Company's export-compliance representations and disclosed no information regarding any diversion of Company products to China through third-party distributors.

86.    On August 5, 2025, Super Micro issued a press release announcing financial results for fiscal year 2025, including reported net sales of $22.0 billion (an increase of 47% year-over-year). In the release, Defendant Liang attributed the Company's growth to "strong demand for our AI and green computing solutions." The Compensation Committee subsequently certified, on August 26, 2025, that the Company had achieved the $21.0 billion revenue milestone under the 2023 CEO Performance Award based on the Company's previous four consecutive fiscal quarter, triggering vesting eligibility for the fifth and final tranche of the option award, subject only to satisfaction of the corresponding stock price goal.

87.    On August 28, 2025, Super Micro filed with the SEC its 2025 10-K, signed by Defendants Liang, Weigand, Sara Liu, Liaw, and the other directors then serving. The 2025 10-K repeated the Company's representations that its internal control over financial reporting was effective, that the Company maintained controls to ensure compliance with applicable laws and regulations, and that the Company's reported sales growth was attributable to legitimate demand for the Company's AI infrastructure products.

88.    On November 7, 2025, Super Micro filed its Quarterly Report on Form 10-Q for the first quarter of fiscal year 2026, signed by Defendants Liang and Weigand. On February 6, 2026, Super Micro filed its Quarterly Report on Form 10-Q for the second quarter of fiscal year 2026, signed by Defendants Liang and Weigand. Each of these reports repeated the Company's export-compliance representations and disclosed no information regarding any diversion of Company products to China through third-party distributors.

**G.      The Indictment Of Defendant Liaw And Two Co-Conspirators**

89.      On March 19, 2026, the United States Attorney's Office for the Southern District of New York announced that a federal grand jury had returned an Indictment charging Defendant Liaw and two co-conspirators—Ruei-Tsang "Steven" Chang (a sales manager in Super Micro's Taiwan office) and Ting-Wei "Willy" Sun (a contractor)—with conspiracy to commit export-control violations. Defendant Liaw was arrested by federal agents on the same day.

90.      The Indictment alleges that Liaw and his co-conspirators "conspired to systematically divert" Super Micro servers containing certain Nvidia GPUs to China without a license, in violation of U.S. export-control laws. According to the Indictment, between calendar years 2024 and 2025, Liaw caused the sale of at least approximately $2.5 billion worth of Super Micro servers to Company-1, a Southeast Asian passthrough entity,  with the knowledge that the majority of those servers would be diverted to China. The operational details of the scheme, the obstruction of the Company's internal compliance functions, and the obstruction of U.S. government export-control oversight are set forth in the paragraphs that follow.

91.      Specifically, the Indictment alleges that, in October 2024 — at or around the same time that EY was resigning as the Company's auditor — Super Micro's own internal compliance team placed a temporary hold on shipments to Company-1 and initiated an audit of Company-1 in response to rapid growth in Company-1's order volumes (the "October 2024 Internal Audit"). According to the Indictment, Defendant Liaw and Chang took active steps to obstruct the October 2024 Internal Audit, including by (a) preventing the auditors from physically entering Company-1's purported data-center facilities; (b) arranging for an auditor whom Chang described in writing as "friendly" to conduct the review; and (c) fabricating purported data-center lease agreements to create the false appearance that Company-1 possessed sufficient data-center capacity to justify its server purchases. Defendant Liaw's obstruction of the October 2024 Internal Audit, the Company's own controls-function effort to detect the very export-control violations the Special Committee subsequently failed to detect, occurred while Liaw was a member of the Board and Senior Vice President of Business Development.

92. The Indictment further alleges that, on or about December 14, 2024, twelve days after the Special Committee's December 2, 2024 export-control "clearance," Defendant Liaw texted an executive of Company-1: "Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine . . . Then we can propose to [Nvidia] with the way they can accept . . . This is the only way to have [Nvidia] to promise the B200 allocation so far as I know." Liaw thereafter continued to coordinate the diversion of Super Micro servers to China through the entirety of fiscal year 2025 and into fiscal year 2026.

93. The Indictment further alleges that, in April 2025, Super Micro's internal compliance team again imposed a temporary hold on shipments to Company-1 and initiated a second audit (the "April 2025 Internal Audit"). Defendant Liaw and his co-conspirators undermined the April 2025 Internal Audit by drafting persuasive responses to the Company's compliance team in an effort to lift the hold. After the hold was lifted, Company-1's purchase orders to Super Micro "ballooned." Between late April 2025 and mid-May 2025 alone, at least approximately $510 million worth of Super Micro servers, assembled in the United States and containing Nvidia GPUs subject to U.S. export controls, were sold to Company-1 and then diverted to China.

94. The Indictment further alleges that, in August 2025, the BIS notified Super Micro directly that it had reason to believe that Company-1 was diverting the Company's servers to China, and BIS requested that Super Micro impose a compliance hold on all shipments to Company-1. BIS's August 2025 notification was a direct communication to the Company that one of its largest customers was unlawfully diverting controlled U.S. technology to China. Notwithstanding this notification, the Individual Defendants allowed the Company to continue to issue periodic SEC reports containing materially false and misleading statements and omissions—including the 2025 10-K filed on August 28, 2025, the Form 10-Q filed on November 7, 2025, and the Form 10-Q filed on February 6, 2026. These filings repeated boilerplate export-compliance risk disclosures as if the Company's compliance posture were merely hypothetical and failed to disclose the BIS notification or the underlying misconduct.

29

95.     The Indictment further alleges that, in December 2025, a BIS export-control officer conducted a post-shipment verification at a warehouse purportedly used by Company-1. According to the Indictment, co-conspirator Ting-Wei "Willy" Sun impersonated a law-firm assistant during the verification visit and presented the BIS officer with "dummy" non-working servers that had been staged at the warehouse the previous day. The Indictment also alleges that, upon receipt of photographs and video of the staged dummy servers, Defendant Liaw responded "That's spectacular!" and immediately pressed Company-1 to place additional orders, writing "Order now!" The December 2025 BIS verification visit and the staged-dummy-server response demonstrate the brazen continuation of the diversion scheme into the months immediately preceding the unsealing of the Indictment.

96.     The Indictment further alleges that, as a result of the scheme, Company-1 became one of Super Micro's most significant customers. According to an internal Company spreadsheet for the fourth quarter of fiscal year 2024, Company-1 ranked as Super Micro's eleventh most profitable customer worldwide, accounting for approximately $99.7 million in revenue for the quarter, alongside major U.S. technology and social media companies developing artificial intelligence infrastructure.

97.     On March 20, 2026, in response to the disclosures, the price of Super Micro's common stock declined $10.26 per share, or approximately 33%, from a closing price of $30.79 on March 19, 2026, to a closing price of $20.53 on March 20, 2026. Following the disclosure, Super Micro placed Defendant Liaw and another employee co-conspirator on administrative leave and terminated its relationship with the contractor co-conspirator. Shortly thereafter, Defendant Liaw resigned from the Board and departed the Company. However, the Board has not recovered any portion of the proceeds of the illegal sales or commenced any independent investigation of the failures of governance that enabled the scheme.

**H.     Super Micro's False And Misleading Proxy Statements**

98.     On April 24, 2025, the Company filed with the SEC its 2025 Proxy Statement. The 2025 Proxy Statement was issued during the period of misconduct alleged herein and was

30

authorized by the Board. The 2025 Proxy Statement solicited stockholder votes to, among other things, elect Defendants Blair and Giordano to three-year terms as directors of the Company; approve, on a non-binding advisory basis, the compensation of the Company's named executive officers for fiscal year 2024 (including the salary, bonus, equity awards, and other compensation paid to Defendants Liang and Weigand); and ratify the appointment of the Company's independent registered public accounting firm.

99.   On March 3, 2026, the Company filed with the SEC its 2026 Proxy Statement. The 2026 Proxy Statement was issued during the period of misconduct alleged herein and was authorized by the Board. The 2026 Proxy Statement solicited stockholder votes to, among other things, elect Defendants Liang, Tally Liu, and Tuan to three-year terms as Class I directors of the Company; approve, on a non-binding advisory basis, the compensation of the Company's named executive officers for fiscal year 2025 (including the salary, bonus, equity awards, and other compensation paid to Defendants Liang, Weigand, and the Company's other named executive officers); ratify the appointment of BDO as the Company's independent registered public accounting firm for fiscal year 2026; and approve an amendment and restatement of the Company's 2020 Equity and Incentive Compensation Plan.

100.   The 2025 Proxy Statement and the 2026 Proxy Statement (together, the "Proxy Statements") each described the Board's risk-oversight processes and represented that the Board, directly and through its committees, was actively engaged in oversight of the Company's material risks and compliance functions. The 2026 Proxy Statement stated:

> The Board oversees our risk management activities, requesting and receiving reports from management. The Board conducts this oversight directly and through its committees. The Board has delegated primary responsibility for oversight of risks relating to financial controls and reporting to our Audit Committee. The Audit Committee also assists the Board in oversight of certain other risks, including internal controls and review of related party transactions. The Audit Committee reports to the full Board on such matters as appropriate.

101.   The Proxy Statements further represented that the Audit Committee's responsibilities included, among other things: "Reviews, approves and oversees all related party

31

transactions in accordance with our related party transaction policies and procedures"; "Establishes and oversees procedures for the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters and oversees enforcement, compliance and remedial measures under our Code of Business Conduct and Ethics"; "Initiates investigations and hires legal, accounting and other outside advisors or experts to assist the Audit Committee, as it deems necessary to fulfill its duties"; and "Periodically reviews and discusses with management our major financial risk exposures, including cybersecurity events and steps management has taken to monitor and control the exposures, including our risk assessment and risk management guidelines and policies."

102. The Proxy Statements further represented that the Compensation Committee "Monitors and assesses risks associated with our compensation policies, including whether such policies could lead to unnecessary risk-taking behavior, and consults with management regarding such risks." The Proxy Statements also represented that the Company's compensation policies and practices were not reasonably likely to have a material adverse effect on the Company.

103. The Proxy Statements further represented that the Company had adopted the Code of Conduct, applicable to all directors, executive officers, and employees, embodying "our principles and practices relating to the ethical conduct of our business and our long-standing commitment to honesty, fair dealing, accurate disclosures, and full compliance with applicable laws, rules, and regulations affecting our business."

104. The representations in the Proxy Statements regarding the Board's risk-oversight practices, the Audit Committee's compliance-oversight responsibilities, the Compensation Committee's risk-monitoring responsibilities, and the Company's commitment to legal compliance were materially false and misleading and omitted material information. Contrary to the representations made in the Proxy Statements, the Board was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial

32

condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. The Proxy Statements further contained false and misleading statements concerning the Company's compensation policies and practices, because the Proxy Statements failed to disclose that the Compensation Committee had certified, and was poised to certify, vesting milestones under the 2023 CEO Performance Award based on Company revenues that were the product of illegal export-control violations.

105. The Proxy Statements also omitted to disclose material facts necessary to make the statements therein not misleading. In particular, the Proxy Statements omitted to disclose: (a) that a co-founder, sitting director, and senior officer of the Company—Defendant Liaw—was actively orchestrating a scheme to divert billions of dollars' worth of Super Micro servers to China in violation of U.S. export-control laws; (b) that material portions of the Company's reported revenue and revenue growth were the product of that illegal conduct; (c) that the milestones under the 2023 CEO Performance Award were being achieved in part on the strength of revenues that were the product of illegal conduct; (d) that the Audit Committee's oversight of legal compliance was not functioning effectively; and (e) that the Board's decisions to nominate Liaw for re-election in January 2024, and to retain him in his senior officer position, posed a continuing risk to the Company.

106. Pursuant to the 2025 Proxy Statement, on June 4, 2025, the Company's stockholders elected Defendants Blair and Giordano to three-year terms as directors of the Company, approved on an advisory basis the Company's fiscal year 2024 executive compensation, and ratified the appointment of the Company's independent registered public accounting firm. The Company subsequently filed with the SEC a Current Report on Form 8-K announcing the results of the meeting.

33

107. Pursuant to the 2026 Proxy Statement, on April 15, 2026—less than four weeks after the unsealing of the Indictment of Director Defendant Liaw—the Company's stockholders elected Defendants Liang, Tally Liu, and Tuan to three-year terms as directors of the Company, approved on an advisory basis the Company's fiscal year 2025 executive compensation (including the milestone-based vesting of tranches under the 2023 CEO Performance Award), ratified the appointment of BDO as the Company's independent registered public accounting firm for fiscal year 2026, and approved the amendment and restatement of the 2020 Equity and Incentive Compensation Plan. The Company subsequently filed with the SEC a Current Report on Form 8-K announcing the results of the meeting.

## I.   Super Micro Is Sued In Securities Class Actions

108. On March 25, 2026, *Bhuva v. Super Micro Computer, Inc., et al.*, No. 3:26-cv-02606-JSC, was filed in this Court against the Company, Defendant Liang, and Defendant Weigand, asserting violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. The Bhuva plaintiff seeks damages on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Super Micro securities between April 30, 2024 and March 19, 2026, inclusive. The Bhuva complaint alleges that the named defendants made false and misleading statements and material omissions concerning the Company's compliance with U.S. export-control laws and the sources of the Company's reported sales growth.

109. On April 8, 2026, *City of Hialeah Employees' Retirement System v. Super Micro Computer, Inc.*, et al., No. 3:26-cv-03018-CRB, was filed in this Court against the Company, Defendant Liang, Defendant Weigand, and Defendant Liaw, asserting the same federal-securities-law claims on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Super Micro common stock between February 2, 2024 and March 19, 2026, inclusive. The Hialeah complaint expands the class period and names Defendant Liaw as a defendant.

34

110. As a result of the Securities Class Actions, the Company will incur substantial costs defending itself and its officers and faces further substantial costs in the event of adverse judgments or settlements.

**J.      Damages To Super Micro**

111. As a direct and proximate result of the Individual Defendants' misconduct, Super Micro has suffered substantial damages, including, without limitation: (a) the costs of defending the Securities Class Action, and the substantial exposure to liability and settlement costs associated with that litigation; (b) the regulatory exposure to the U.S. Department of Justice and the U.S. Department of Commerce in connection with the conduct that gave rise to the Indictment of Defendant Liaw and the conduct described therein, including the potential for civil and criminal penalties and the imposition of remedial measures; (c) the costs of the internal investigations the Board should have—but did not—undertake; (d) the cumulative impairment in stockholder confidence reflected in the August 28, 2024 partial-disclosure decline (the price of Super Micro common stock fell 19%, from $54.76 on August 27, 2024 to $44.35 on August 28, 2024 (pre-split equivalents), following the announcement that the Company would not timely file its 2024 10-K and that the Audit Committee was reviewing "other matters"); the October 30, 2024 partial-disclosure decline (the price of Super Micro common stock fell $16.05 per share, or 32.6%, from $49.12 on October 29, 2024 to $33.07 on October 30, 2024, following the disclosure of EY's resignation and the Special Committee's appointment); and the March 20, 2026 33% one-day decline (from $30.79 on March 19, 2026 to $20.53 on March 20, 2026) following the unsealing of the Indictment, and the resulting impairment of the Company's ability to access the capital markets; (e) the loss of customer and supplier confidence, including the potential loss of the Company's strategic relationship with Nvidia; and (f) the substantial diversion of management and Board attention from the legitimate business of the Company to the response to the Indictment and related fallout.

112. Had the Individual Defendants taken timely action to implement an effective export-compliance function, to remediate the export-compliance failures previously identified in

connection with the Russia-evasion allegations, to investigate the repeated red flags regarding the diversion of Super Micro servers to China, or to remove Defendant Liaw from his positions of trust at the Company, the damage caused to Super Micro could have been prevented or at least minimized.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

113.    Plaintiff brings this action derivatively in the right and for the benefit of Super Micro to redress injuries suffered, and to be suffered, by Super Micro as a direct result of the breaches of fiduciary duty and violations of the federal securities laws by the Individual Defendants. Super Micro is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

114.    Plaintiff will adequately and fairly represent the interests of Super Micro in enforcing and prosecuting its rights, and Plaintiff has retained counsel experienced in stockholder derivative litigation to do so.

115.    Plaintiff has been a stockholder of Super Micro continuously at all relevant times, including at the time of the wrongs complained of herein.

116.    Plaintiff did not make a demand on the Board to institute this action because, as set forth in greater detail below, such a demand would be a futile and useless act. At the time this action was filed, the Board consisted of the following eight directors (collectively, the "Director Defendants"): Charles Liang, Sara Liu, Tally Liu, Sherman Tuan, Judy Lin, Robert Blair, Susan Mogensen (a/k/a Susie Giordano), and Scott Angel. A majority of these Director Defendants is neither disinterested nor independent of one another and of the Officer Defendants and cannot impartially evaluate a demand to commence this action.

### A.    Demand Is Futile As To Defendant Liang

117.    Demand is futile as to Defendant Liang. Liang is not independent. Liang has served as President, CEO, and Chairman of the Board of Super Micro since the Company's inception in September 1993. The 2026 Proxy Statement does not list Liang as an independent director. As an employee of Super Micro, the Company provides Liang with his principal occupation, from which

36

he receives substantial compensation, including $28,094,976 in option awards in 2024. Thus, Liang could not consider a demand for action that might require him to sue the directors who control his continued employment and substantial compensation or fellow members of management with whom he works on a day-to-day basis.

118. Liang is not disinterested. As the Company's CEO during the period of misconduct alleged herein, Liang signed each of the Annual Reports on Form 10-K and Sarbanes-Oxley certifications described herein, and made statements on the Company's earnings calls and in its press releases attributing the Company's reported revenue growth to legitimate "demand" and "technology leadership" without disclosing the role of illegal export-control diversions in driving that growth. Liang is a named defendant in the Securities Class Action and faces a substantial likelihood of liability for violations of Section 10(b) of the Exchange Act, breach of fiduciary duty, and unjust enrichment. Liang's interest in not pursuing those claims renders him incapable of impartially evaluating a demand to do so.

119. The Co-Founder Defendants, Liang, Sara Liu, and Liaw, control a collective 16% of the Company's voting power. This significant ownership enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Further, in the 2025 10-K, the Company disclosed that the Company has a key dependency on Defendant Liang. As such, none of the other members of the Super Micro Board would take action against Liang given his position of control.

120. Liang also faces a substantial likelihood of liability for unjust enrichment. As described above, the Compensation Committee, during the period of misconduct alleged herein, certified the achievement of four of the five revenue milestones under Liang's 2023 CEO Performance Award. Each certified milestone was achieved on the strength of Company revenues that were inflated by the illegal export-control diversion scheme described herein. Liang received the economic benefit of vesting of four million shares of common stock (at an exercise price of

$45.00 per share) tied to those certified milestones, and thus benefited personally from the misconduct that this action seeks to remedy.

121. Liang authorized the Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act. Liang benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Board through the false and misleading statements and material omissions in the 2026 Proxy Statement.

122. As a Super Micro director, Liang was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

123. For the foregoing reasons, Defendant Liang is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Liang is futile and, thus, excused.

**B.    Demand Is Futile As To Defendant Sara Liu**

124. Demand is futile as to Defendant Sara Liu. Sara Liu is not independent. The 2026 Proxy Statement does not list Sara Liu as an independent director. Sara Liu is the spouse of Defendant Liang, with whom she jointly owns 82,084,339 shares of Super Micro common stock (approximately 13.4%). Sara Liu serves as a Senior Vice President of the Company. Her continued employment, compensation, and significant family wealth depend upon her fellow directors not pursuing the claims asserted herein, particularly the claims against her spouse.

125.    The Co-Founder Defendants, Liang, Sara Liu, and Liaw, control a collective 16% of the Company's voting power. This significant ownership enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Further, in the 2025 10-K, the Company disclosed that the Company has a key dependency on Defendant Liang. As such, none of the other members of the Super Micro Board would take action against Sara Liu given her position of control.

126.    Sara Liu also faces a substantial likelihood of liability for breach of fiduciary duty. As a director throughout the period of misconduct alleged herein, Sara Liu signed the 2024 10-K and the 2025 10-K, each of which contained false and misleading statements as described herein. Sara Liu authorized both Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act.

127.    As a Super Micro director, Sara Liu was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

128.    For the foregoing reasons, Defendant Sara Liu is neither disinterested nor independent, and she faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Sara Liu is futile and, thus, excused.

**C.      Demand Is Futile As To Defendant Tally Liu**

129.    Defendant Tally Liu will not act against the Co-Founder Defendants given that their position of control enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Moreover, the Company has a key person dependency on Liang that further tightens his grip on the Company, its directors and officers.

130.    Tally Liu has served as Chair of the Audit Committee continuously throughout the period of misconduct alleged herein. As Chair of the Audit Committee, Tally Liu had primary oversight responsibility for the Company's financial reporting, internal controls over financial reporting, and enterprise risk management. The Audit Committee met seventy times in fiscal year 2025, an extraordinary level of activity that confirms Tally Liu's awareness of significant ongoing issues at the Company. Tally Liu utterly failed to perform these essential duties.

131.    As Chair of the Audit Committee, Tally Liu bore primary responsibility for the Special Committee's December 2, 2024 review of the eleven export-control transactions flagged by EY. The Special Committee, the work of which was reviewed and ratified by the Audit Committee under Tally Liu's chairmanship, affirmatively cleared the Company of export-control violations, concluding that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions." That conclusion was false—as the Indictment unsealed approximately fifteen months later established, a member of the Board was at that very moment orchestrating the diversion of billions of dollars' worth of Super Micro servers to China, and continued the scheme through at least February 2026. Tally Liu, having presided over the Audit Committee through (a) the formation of the Special Committee, (b) the Special Committee's investigation of the eleven export-control transactions, (c) the affirmative export-control "clearance" issued on December 2, 2024, and (d) the subsequent failure to revisit that clearance notwithstanding the April 2025 internal compliance hold, the August 2025 BIS

notification, and the other red flags described above, has a substantial likelihood of liability for breach of fiduciary duty therefor.

132. As a member of the Compensation Committee, Tally Liu had primary oversight responsibility for monitoring and assessing risks associated with the Company's compensation policies, including whether those policies could lead to unnecessary risk-taking behavior. Tally Liu participated in certifying the achievement of milestones under the 2023 CEO Performance Award based on Company revenues that were inflated by illegal export-control violations, including the April 22, 2025 certifications of three revenue milestones and the August 26, 2025 certification of the $21.0 billion revenue milestone. Thus, Tally Liu utterly failed to perform these essential duties.

133. Tally Liu authorized both Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act. Tally Liu benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Board through the false and misleading statements and material omissions in the 2026 Proxy Statement.

134. As a Super Micro director, Tally Liu was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

135.    For the foregoing reasons, Defendant Tally Liu is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Tally Liu is futile and, thus, excused.

**D.        Demand Is Futile As To Defendant Tuan**

136.    Defendant Tuan will not act against the Co-Founder Defendants given that their position of control enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Moreover, the Company has a key person dependency on Liang that further tightens his grip on the Company, its directors and officers.

137.    As a member of the Compensation Committee, Tuan had primary oversight responsibility for monitoring and assessing risks associated with the Company's compensation policies, including whether those policies could lead to unnecessary risk-taking behavior. Tuan participated in certifying the achievement of milestones under the 2023 CEO Performance Award based on Company revenues that were inflated by illegal export-control violations, including the April 22, 2025 certifications of three revenue milestones and the August 26, 2025 certification of the $21.0 billion revenue milestone. Thus, Tuan utterly failed to perform these essential duties.

138.    As a member of the Governance Committee, Tuan had primary oversight responsibility for assessing director qualifications, recommending the resignation of directors no longer fit to serve, and providing guidance to the Board on legal-compliance matters. Tuan has not recommended that Defendant Liaw resign from the Board following the unsealing of the Indictment, has not provided guidance to the Board concerning the legal-compliance failures that gave rise to the Indictment, and has not exercised the Governance Committee's authority to retain independent advisors in connection with those failures. Thus, Tuan utterly failed to perform these essential duties.

139.    Tuan authorized both Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial

likelihood of liability therefor under Section 14(a) of the Exchange Act. Tuan benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Board through the false and misleading statements and material omissions in the 2026 Proxy Statement.

140.    As a Super Micro director, Tuan was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

141.    For the foregoing reasons, Defendant Tuan is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Tuan is futile and, thus, excused.

**E.    Demand Is Futile As To Defendant Lin**

142.    Defendant Lin will not act against the Co-Founder Defendants given that their position of control enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Moreover, the Company has a key person dependency on Liang that further tightens his grip on the Company, its directors and officers.

143.    As Chair of the Governance Committee, Lin had primary oversight responsibility for assessing director qualifications, recommending the resignation of directors no longer fit to serve, and providing guidance to the Board on legal-compliance matters. Lin has not recommended that Defendant Liaw resign from the Board following the unsealing of the Indictment, has not provided guidance to the Board concerning the legal-compliance failures that gave rise to the

43

Indictment, and has not exercised the Governance Committee's authority to retain independent advisors in connection with those failures. Thus, Lin utterly failed to perform these essential duties.

144. Lin authorized both Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act.

145. As a Super Micro director, Lin was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

146. For the foregoing reasons, Defendant Lin is neither disinterested nor independent, and she faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Lin is futile and, thus, excused.

**F.      Demand Is Futile As To Defendant Blair**

147. Defendant Blair will not act against the Co-Founder Defendants given that their position of control enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Moreover, the Company has a key person dependency on Liang that further tightens his grip on the Company, its directors and officers.

148. Blair is designated as an Audit Committee financial expert under Item 407 of Regulation S-K. As a member of the Audit Committee, Blair had primary oversight responsibility for the Company's financial reporting, internal controls over financial reporting, and enterprise

44

risk management. The Audit Committee met seventy times in fiscal year 2025, an extraordinary level of activity that confirms Blair's awareness of significant ongoing issues at the Company. Blair utterly failed to perform these essential duties.

149. As a member of the Audit Committee throughout the period of misconduct alleged herein, Blair bore responsibility for the Special Committee's December 2, 2024 review of the eleven export-control transactions flagged by EY. The Special Committee, the work of which was reviewed and ratified by the Audit Committee of which Blair was a member, affirmatively cleared the Company of export-control violations, concluding that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions." That conclusion was false—as the Indictment unsealed approximately fifteen months later established, a member of the Board was at that very moment orchestrating the diversion of billions of dollars' worth of Super Micro servers to China, and continued the scheme through at least February 2026. Blair, having served as a member of the Audit Committee through (a) the formation of the Special Committee, (b) the Special Committee's investigation of the eleven export-control transactions, (c) the affirmative export-control "clearance" issued on December 2, 2024, and (d) the subsequent failure to revisit that clearance notwithstanding the April 2025 internal compliance hold, the August 2025 BIS notification, and the other red flags described above, has a substantial likelihood of liability for breach of fiduciary duty therefor.

150. As a member of the Governance Committee, Blair had primary oversight responsibility for assessing director qualifications, recommending the resignation of directors no longer fit to serve, and providing guidance to the Board on legal-compliance matters. Blair has not recommended that Defendant Liaw resign from the Board following the unsealing of the Indictment, has not provided guidance to the Board concerning the legal-compliance failures that gave rise to the Indictment, and has not exercised the Governance Committee's authority to retain independent advisors in connection with those failures. Thus, Blair utterly failed to perform these essential duties.

45

151. Blair authorized both Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act. Blair benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

152. As a Super Micro director, Blair was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

153. For the foregoing reasons, Defendant Blair is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Blair is futile and, thus, excused.

**G.    Demand Is Futile As To Defendant Giordano**

154. Defendant Giordano will not act against the Co-Founder Defendants given that their position of control enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a merger or sale of assets and other significant corporate transactions. Moreover, the Company has a key person dependency on Liang that further tightens his grip on the Company, its directors and officers.

155. As Chair of the Compensation Committee, Giordano had primary oversight responsibility for monitoring and assessing risks associated with the Company's compensation policies, including whether those policies could lead to unnecessary risk-taking behavior.

46

Giordano participated in certifying the achievement of milestones under the 2023 CEO Performance Award based on Company revenues that were inflated by illegal export-control violations, including the April 22, 2025 certifications of three revenue milestones and the August 26, 2025 certification of the $21.0 billion revenue milestone. Thus, Giordano utterly failed to perform these essential duties.

156.    Giordano authorized both Proxy Statements, each of which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act. Giordano benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to a three-year term on the Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

157.    As a Super Micro director, Giordano was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

158.    For the foregoing reasons, Defendant Giordano is neither disinterested nor independent, and she faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Giordano is futile and, thus, excused.

**H.    Demand Is Futile As To Defendant Angel**

159.    Defendant Angel will not act against the Co-Founder Defendants given that their position of control enables them to control Super Micro's management and affairs, and most matters requiring stockholder approval, including the election of directors, financing activities, a

merger or sale of assets and other significant corporate transactions. Moreover, the Company has a key person dependency on Liang that further tightens his grip on the Company, its directors and officers.

160.    Angel is designated as an Audit Committee financial expert under Item 407 of Regulation S-K. Prior to joining the Board, Angel spent more than 37 years in the audit and assurance practice at Deloitte, including 25 years as an audit partner in Silicon Valley focusing on technology companies. As a member of the Audit Committee and given his deep professional background in evaluating internal controls and compliance functions of technology companies, Angel had primary oversight responsibility for the Company's financial reporting, internal controls over financial reporting, and enterprise risk management. Angel utterly failed to perform these essential duties.

161.    As Lead Independent Director, Angel presides over executive sessions of the independent directors and has authority to retain independent advisors at the Company's expense, authority that he has, to Plaintiff's knowledge, not exercised in connection with the export-control violations alleged herein.

162.    As a member of the Audit Committee and Lead Independent Director from the date of his appointment in March 2025, Angel bore responsibility for overseeing the adequacy of the Special Committee's December 2, 2024 review of the eleven export-control transactions flagged by EY. The Special Committee, the work of which stood unreviewed and unrevised by the Audit Committee of which Angel was a member, had affirmatively cleared the Company of export-control violations, concluding that it "did not see any evidence suggesting that anyone at the Company tried to circumvent export control regulations or restrictions." That conclusion was false—as the Indictment unsealed approximately three months after Angel's appointment established, a member of the Board was at that very moment orchestrating the diversion of billions of dollars' worth of Super Micro servers to China and continued the scheme through at least February 2026. Angel, having served as a member of the Audit Committee and as Lead Independent Director through (a) the April 2025 internal compliance hold on Company-1

48

shipments imposed within weeks of his arrival on the Audit Committee, (b) the August 2025 BIS direct notification to the Company that Company-1 was diverting Super Micro servers to China, and (c) the subsequent failure to revisit or remediate the Special Committee's December 2, 2024 export-control "clearance" notwithstanding these escalating red flags and his authority as Lead Independent Director to retain independent advisors at the Company's expense, has a substantial likelihood of liability for breach of fiduciary duty therefor.

163. Angel authorized the 2026 Proxy Statement, which contained false and misleading statements and material omissions as described herein, and faces a substantial likelihood of liability therefor under Section 14(a) of the Exchange Act.

164. As a Super Micro director, Angel was required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

165. For the foregoing reasons, Defendant Angel is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Angel is futile and, thus, excused.

## J.    Additional Reasons Demand Is Futile

166. Demand is further excused as to all of the Director Defendants for the following additional reasons:

167. The Director Defendants have demonstrably failed to remediate a serial pattern of export-compliance failures at the Company. As alleged above, the Hindenburg Research report of August 27, 2024 placed the Director Defendants on unmistakable notice that the Company's

export-compliance function was inadequate, having allegedly permitted the shipment of products into the Russian Federation in violation of U.S. trade restrictions through a California distributor and a network of Turkish shell companies. The Director Defendants did not implement meaningful remediation in response. Instead, they permitted a second and even more brazen export-control violation scheme, this one orchestrated by Defendant Liaw, to proceed without effective oversight. The Director Defendants demonstrated inability or unwillingness to remediate these recurring failures is itself a ground for excusing demand.

168.    The Director Defendants receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their positions on the Board, including the substantial compensation described in the Parties section above. They have thus benefited from the wrongs alleged herein and have engaged in self-dealing.

169.    Publicly traded companies such as Super Micro typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within the scope of this Complaint—particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

170.    For all of the foregoing reasons, demand on the Board is excused as futile.

## VII.    CLAIMS FOR RELIEF

### COUNT I
**Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Derivatively on Behalf of Super Micro Against the Individual Defendants)**

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

172.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff

50

specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of, fraud, scienter, or recklessness with regard to those non-fraud claims.

173.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

174.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

175.    The Proxy Statements were materially false and misleading because the Individual Defendants were required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Super Micro's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's compliance with U.S. export-control laws governing the sale and re-export of advanced computing hardware, and the related dependency of the Company's reported sales growth on compliance with those laws; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices and full compliance with U.S. laws.

176.    The misleading information contained in the 2025 Proxy Statement was material to Super Micro's stockholders in determining whether to elect or re-elect Defendants Blair and Giordano to the Board and to approve, on an advisory basis, the executive compensation paid for fiscal year 2024.

177.    The misleading information contained in the 2026 Proxy Statement was material to Super Micro's stockholders in determining whether to elect or re-elect Defendants Liang, Tally Liu, and Tuan to the Board; to approve, on an advisory basis, the executive compensation paid for fiscal year 2025 (including the milestone-based vesting of tranches under the 2023 CEO Performance Award); to ratify the appointment of the Company's independent registered public accounting firm; and to approve the amendment and restatement of the Company's 2020 Equity and Incentive Compensation Plan.

178.    The material misstatements and omissions in the Proxy Statements damaged the Company.

179.    Plaintiff, on behalf of Super Micro, seeks relief for damages inflicted upon the Company based on the misleading Proxy Statements in connection with the improper re-election of Defendants Liang, Tally Liu, Tuan, Blair, and Giordano to the Board and the approval of executive compensation.

## COUNT II
### Contribution Under Section 21D of the Exchange Act
### (Derivatively on Behalf of Super Micro Against the Individual Defendants)

180.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

181.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

182.    Super Micro is named as a defendant in the Securities Class Actions that alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If Super Micro is found liable for violating the federal securities laws, the Company's liability will arise in

52

whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

183.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Super Micro's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

184.    The Individual Defendants are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

185.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

## COUNT III
### Breach of Fiduciary Duty
**(Derivatively on Behalf of Super Micro Against the Individual Defendants)**

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

187.    The Individual Defendants owed Super Micro and its stockholders fiduciary duties of loyalty, good faith, due care, and candor. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Super Micro alleged herein.

188.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

189.    The Individual Defendants each breached his or her fiduciary duties to Super Micro and its stockholders by, among other things: (a) failing to implement and maintain an effective system of internal controls to ensure Super Micro's compliance with U.S. export-control laws; (b) failing to effectively oversee and monitor the material risks facing the Company, including the risk that the Company's reported sales growth was the product of illegal conduct; (c) failing to investigate and take action upon the repeated red flags described above; (d) causing or permitting the Company to issue materially false and misleading statements concerning its compliance with U.S. export-control laws and the sources of its reported sales growth; (e) personally orchestrating (in the case of Defendant Liaw) the export-control diversion scheme that damaged the Company; and (f) authorizing the issuance of the false and misleading Proxy Statements.

190.    The Individual Defendants further breached their fiduciary duties to Super Micro by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

191.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Super Micro has suffered substantial damages, as described above.

**COUNT IV**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Derivatively on Behalf of Super Micro Against the Individual Defendants)**

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

193.    Each Individual Defendant aided and abetted the other Individual Defendants' breaches of fiduciary duty by knowingly participating in, and substantially assisting, the breaches described above.

194.    Each Individual Defendant knew of the other Individual Defendants' breaches of fiduciary duty. Each Individual Defendant participated in, encouraged, and substantially assisted those breaches by, among other things, signing and/or approving the materially false and misleading public filings described above; authorizing the issuance of the false and misleading Proxy Statements; and failing to investigate the repeated red flags described above.

54

195.    As a direct and proximate result of the Individual Defendants' aiding and abetting of breaches of fiduciary duty, Super Micro has suffered substantial damages, as described above.

**COUNT V**
**Unjust Enrichment**
**(Derivatively on Behalf of Super Micro Against the Individual Defendants)**

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

197.    By their wrongful acts and omissions alleged herein, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Super Micro. The Individual Defendants were unjustly enriched through, among other things, the receipt of compensation, director remuneration, and other benefits and emoluments from Super Micro while they were breaching their fiduciary duties owed to Super Micro and its stockholders.

198.    In particular, Defendant Liang received the economic benefit of the Compensation Committee's certifications, during the period of misconduct alleged herein, of four of the five revenue milestones under the 2023 CEO Performance Award—milestones that were achieved on the strength of Company revenues inflated by the illegal export-control diversion scheme. Liang received the associated vesting of four million shares of common stock at an exercise price of $45.00 per share. Liang has not exercised the 2023 CEO Performance Award as of the date of this Complaint, but the right to do so is itself a substantial economic benefit conferred on Liang as a result of the misconduct alleged herein.

199.    It would be unconscionable to allow the Individual Defendants to retain the unwarranted benefits described above. Plaintiff, on behalf of Super Micro, seeks restitution from the Individual Defendants in the amount of the compensation, director remuneration, and other benefits received while they were breaching their fiduciary duties to the Company.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in favor of Super Micro and against the Individual Defendants, as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Super Micro and that demand on the Board is excused;

B. Declaring that the Individual Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, have breached their fiduciary duties to Super Micro, have aided and abetted one another's breaches of fiduciary duties, have been unjustly enriched, and are liable to Super Micro for contribution under Section 21D of the Exchange Act;

C. Directing Super Micro to take all necessary actions to reform and improve its corporate governance and internal control over financial reporting and compliance with U.S. export-control laws, including, without limitation, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation; taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's oversight of compliance with U.S. export-control laws; and replacing the Audit Committee Defendants with truly independent directors;

D. Awarding to Super Micro restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and breaches of fiduciary duty;

E. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 19, 2026                                          **WEISS LAW**

**OF COUNSEL:**                              By:    */s/ Joel E. Elkins*
                                                              Joel E. Elkins
**WEISS LAW**                                        1801 Century Park East, 24th Floor
David C. Katz                                        Los Angeles, CA 90067
Mark D. Smilow                                       Telephone:  310/208-2800
305 Broadway, 7th Fl.                                Facsimile:   310/209-2348
New York, NY 10007
Telephone: (212) 682-3025                            *Attorneys for Plaintiff David Pill*
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com

Joshua M. Rubin
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com

57

**<u>VERIFICATION</u>**

I, David Pill, hereby verify that I have authorized the filing of the foregoing Verified Stockholder Derivative Complaint, that I have reviewed the foregoing Verified Stockholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct. Executed on: November 19, 2026

*David Pill*
David Pill (May 19, 2026 13:43:32 EDT)
_____
David Pill